IN THE OREGON TAX COURT
MAGISTRATE DIVISION
Property Tax

KNIGHTS BRIDGE CROSSING, LLC,     )
          )
        Plaintiffs,     )   TC-MD 110238N
          )
    v.     )
          )
WASHINGTON COUNTY ASSESSOR,     )
          )
        Defendant.     )   **DECISION**

Plaintiff appeals the 2010-11 real market value of 24 properties, identified as Accounts R2154915, R2154947, R2154956, R2154960, R2154961, R2154965, R2154966, R2154967, R2154968, R2154969, R2154970, R2159471, R2154975, R2154976, R2154977, R2154978, R2154979, R2154980, R2154981, R2154982, R2154983, R2154984, R2154986, and R2154987 (subject properties). A trial was held in the Tax Courtroom in Salem, Oregon, on October 31, 2011. Mladen Baricevic (Baricevic) appeared on behalf of Plaintiff. Mark Hertel appeared behalf of Defendant. Nicholas J. Deatherage (Deatherage), Residential Property Appraiser, testified on behalf of Defendant. Plaintiff's Exhibits 1, 2, and 3 were offered and received without objection. Defendant's Exhibit A was offered and received without objection.

## I.    STATEMENT OF FACTS

The subject properties are all located in Knights Bridge Crossing, a 42-lot subdivision in the North Aloha neighborhood in Aloha, Oregon. (Def's Ex A at 5.) All of the subject properties are "vacant" lots with the exception of lots 16 and 41. (*Id.*) Of the 22 vacant lots, 6 are townhome lots and 16 are detached lots. (*Id.*) Lot 16 is improved with a 1,751-square foot residence that Defendant determined to be "partially complete" as of January 1, 2010, and valued at 47.5 percent of its completed value. (*Id.* at 5, 18.) As of January 1, 2010, lot 41 was

improved with a 100 percent complete 1,894-square foot residence. (*Id.* at 5, 17.) The subject properties range in lot size from .04 to .06-acres. (*Id.* at 5.)

For each of the six townhome lots, the 2010-11 real market value determined by the board of property tax appeals (BOPTA) was $42,000 and the 2010-11 maximum assessed value was $46,510. (*See id.* at 2.) For each of the 16 detached lots, BOPTA sustained the 2010-11 roll real market value of $65,230; the 2010-11 maximum assessed value was $55,080. (*See id.*) For lot 16, BOPTA sustained the 2010-11 roll real market value of $104,480 and the 2010-11 exception value of $25,900; the 2010-11 maximum assessed value was $73,730. (*See id.*) For lot 41, BOPTA sustained the 2010-11 roll real market value of $223,730 and the 2010-11 exception value of $145,150; the 2010-11 maximum assessed value was $159,590. (*See id.*)

A.     *Plaintiff's value evidence*

Baricevic testified that he has been a real estate developer since 1992. He provided a "Comparative Market Analysis" concerning the sale of eight vacant lots on Marlee Lane near the subject properties. (*See* Ptf's Compl at 3; Ptf's Ex 2.) Baricevic testified that the Marlee Lane lots sold in a bulk sale in December 2009 for $240,000, or $30,000 per lot. He testified that two of the Marlee Lane lots were resold in February 2010 for $42,000 per lot. (*See* Def's Ex A at 15, 24.) Baricevic testified that the Marlee Lane lots ranged in size from .06 to .08-acres and are similar to the subject properties in that respect. (*See* Ptf's Ex 2.) He testified that the "total taxable value" of each of the Marlee Lane lots was $37,950 for the 2010-11 tax year. (*See id.*) Baricevic testified that he made no adjustments to the Marlee Lane lot sales and presented no additional evidence regarding variables such as the shape or size of the lots, location, topography, or view; he did not consider any adjustments to be necessary. He testified that, based on the price per lot indicated by the bulk sale and subsequent resale of the Marlee Lane

lots, he determined a real market value range of $30,000 to $42,000 for the subject properties as of January 1, 2010. When questioned as to why he considers the detached lots to be within the same value range as the townhome lots, Baricevic testified that there is not much difference in size between the lots.

Baricevic testified that he could not find any recent comparable sales that were not bank owned. He testified that short sales and foreclosures are the current market reality and should be considered in valuing property. As additional evidence, Baricevic provided a Judgment of Stipulation reducing the value of the subject properties for the 2008-09 tax year. (Ptf's Ex 1.) He testified that the stipulated values serve as evidence that Defendant's values were in error for the 2008-09 tax year and are, therefore, unreliable in this appeal involving the 2010-11 tax year.

B.      *Defendant's value evidence*

Deatherage found the income and cost approaches to have no applicability in this case and relied on the sales comparison approach to determine the value of the subject properties. (Def's Ex A at 24.) As of January 1, 2010, he concluded a real market value of $42,000 for each of the townhome lots, a real market value of $54,000 for each of the detached lots, a value of $230,000 for lot 41, and a value of $104,480 for the "partially complete" lot 16. (*Id.* at 15-18.)

Deatherage testified that he considered the bank owned bulk sale of the eight Marlee Lane lots in December 2009 to be a non-typical market transaction that would require an adjustment to be used as a comparable sale for the subject townhome lots. (*See* Def's Ex A at 24 ("market studies * * * concluded that [bulk transactions] resulted in a sale price discount of 20% from the * * * typical lot sale[]").) Deatherage testified that he relied on the February 2010 resale of two Marlee Lane lots and determined a value of $42,000 for the townhome lots.[1] (*See*

_____

[1] Deatherage made two adjustments to the February 2010 Marlee Lane sale: an upward adjustment of $2,100 for time and downward adjustment of $2,100 for "[g]reenway[.]" (Def's Ex A at 15.)

*id.* at 15, 24.) Deatherage identified four comparable sales for the detached lots that occurred between June 2009 and October 2010. (*Id.* at 16.) He made adjustments for time, size, and "Access/Limited Parking," determined adjusted sale prices ranging from $51,500 to $55,900, and concluded a 2010-11 real market value of $54,000 for each of the detached lots.[2] (*Id.* at 16, 24.)

Deatherage testified that, to determine the values of improved lots 16 and 41, he identified five comparable sales from within the Knights Bridge Crossing subdivision. He testified that, after making adjustments for time and square feet, the adjusted sale prices ranged from $218,800 to $235,842 for lot 41 and from $213,300 to $229,040 for lot 16. (*See id.* at 17, 18.) Deatherage determined a 2010-11 real market value of $230,000 for lot 41. (*Id.* at 17.) He determined an "INDICATED VALUE IF 100% COMPLETE" of $220,000 for lot 16, and a 2010-11 real market value of $104,480, reflecting partial completion. (*Id.* at 18.)

Baricevic criticized Deatherage's comparable sales approach, noting that some of his sales occurred more than "a few months" from the January 1, 2010, assessment date, and stating that the need for adjustments suggests that Deatherage's sales are not "truly comparable sales." Deatherage responded that it would be ideal to find an "identical property" that sold "next door" on the "assessment date," but that is not possible. He testified that his comparable sales are similar to the subject lots in many respects, but required some adjustments for differences.

## II. ANALYSIS

The issue before the court is the real market value of the subject properties for the 2010-11 tax year. "Real market value is the standard used throughout the ad valorem statutes except for special assessments." *Richardson v. Clackamas County Assessor (Richardson)*, TC-MD No

---

[2] Deatherage testified that comparable sale four for the detached lots sold as part of a bulk sale, but it was not bank owned and he determined that it was a market transaction. (*See also* Def's Ex A at 24.)

020869D, WL 21263620 at *2 (Mar 26, 2003) (citing *Gangle v. Dept. of Rev.*, 13 OTR 343, 345 (1995)). Real market value is defined in ORS 308.205(1), which states:

> "Real market value of all property, real and personal, means the amount in cash that could reasonably be expected to be paid by an informed buyer to an informed seller, each acting without compulsion in an arm's length transaction occurring as of the assessment date for the tax year."[3]

The assessment date for the 2010-11 tax year was January 1, 2010. ORS 308.007; ORS 308.210.

"Real market value in all cases shall be determined by methods and procedures in accordance with rules adopted by the Department of Revenue * * *." ORS 308.205(2). There are three methods of valuation that are used to determine real market value: (1) the cost approach, (2) the sales comparison approach, and (3) the income approach. *Allen v. Dept. of Rev.*, 17 OTR 248, 252 (2003); *see also* OAR 150-308.205-(A)(2)(a) (stating that all three approaches must be considered, although all three approaches may not be applicable to the valuation of the subject property). The approach of valuation to be used is a question of fact to be determined on the record. *Pacific Power & Light Co. v. Dept. of Rev.*, 286 Or 529, 533 (1979). Both parties relied only upon the comparable sales approach. OAR 150-308.205-(A)(2)(c) states:

> "In utilizing the sales comparison approach only actual market transactions of property comparable to the subject, or adjusted to be comparable, will be used. All transactions utilized in the sales comparison approach must be verified to ensure they reflect arms-length market transactions. When nontypical market conditions of sale are involved in a transaction (duress, death, foreclosures, interrelated corporations or persons, etc.) the transaction will not be used in the sales comparison approach unless market-based adjustments can be made for the nontypical market condition."

/ / /

/ / /

---

[3] All references to the Oregon Revised Statutes (ORS) and to the Oregon Administrative Rules (OAR) are to 2009.

"The court looks for arm's-length sale transactions of property similar in size, quality, age and location * * * in order to determine the [real market value]" of the subject property. *Richardson*, WL 21263620 at *3.

Plaintiff has the burden of proof and must establish its case by a preponderance of the evidence. ORS 305.427. A "[p]reponderance of the evidence means the greater weight of evidence, the more convincing evidence." *Feves v. Dept. of Revenue*, 4 OTR 302, 312 (1971). "[I]t is not enough for a taxpayer to criticize a county's position. Taxpayers must provide competent evidence of the [real market value] of their property." *Poddar v. Dept. of Rev.,* 18 OTR 324, 332 (2005) (quoting *Woods v. Dept. of Rev.*, 16 OTR 56, 59 (2002)) (internal quotation marks omitted). "[I]f the evidence is inconclusive or unpersuasive, the taxpayer will have failed to meet his burden of proof * * *." *Reed v. Dept. of Rev.,* 310 Or 260, 265, 798 P2d 235 (1990). "[T]he court has jurisdiction to determine the real market value or correct valuation on the basis of the evidence before the court, without regard to the values pleaded by the parties." ORS 305.412.

A.      *Townhome lots*

Baricevic requests that the 2010-11 real market value of the subject properties be reduced to a value within the range of $30,000 to $42,000. He relies on the December 2009, bulk sale of eight bank owned lots on Marlee Lane for $30,000 per lot, and the subsequent resale of two of those lots in February 2010, for $42,000 per lot. Deatherage disagrees that the December 2009, sale provides a reliable indication of real market value because it was a bank owned bulk sale. However, Deatherage agrees that the February 2010 sale of two Marlee Lane lots for $42,000 per lot is persuasive evidence of the value of the townhome lots and requests that the 2010-11 real market value of $42,000 for each of the townhome lots be sustained. The court agrees with

Deatherage that the December 2009 sale of the eight Marlee Lane lots involves "nontypical market conditions" and cannot be used in the sales comparison approach absent "market-based adjustments" for the "nontypical market conditions." OAR 150-308.205-(A)(2)(c). The court finds that the 2010-11 real market value of each of the townhome lots was $42,000.

B.      *Detached lots; improved lots 16 and 41*

Baricevic again relies on the December 2009 and February 2010 Marlee Lane lot sales as support for the 2010-11 real market value of the detached lots and improved lots 16 and 41. Baricevic's value conclusion of $30,000 to $42,000 per lot for all of the subject properties fails to account for any differences between the townhome lots, the detached lots, and the two improved lots. In support of his opposition to the use of adjustments in the sales comparison approach, Baricevic testified that adjustments suggest a lack of comparability. Baricevic is correct that excessive adjustments may indicate that two properties are not sufficiently similar for a reliable determination of value under the sales comparison approach. However, failing to adjust for differences in the sales comparison approach is contrary to the requirements of OAR 150-308.205-(A)(2)(c). Baricevic's determination of a value range from $30,000 to $42,000 for the detached lots and the two improved lots is given no weight in the court's analysis.

Deatherage presented a comparable sales approach including reasonable adjustments for differences in time, lots size, parking access, and square feet (for the two improved lots). He determined a real market value of $54,000 for each of the detached lots, a real market value of $230,000 for lot 41, and a real market value of $104,480 for lot 16, reflecting its status of "partially complete" as of January 1, 2010.[4] The court finds that Deatherage's value conclusions for the detached lots and the improved lots 16 and 41 are supported by the evidence presented.

---

[4] Deatherage concluded that the 2010-11 real market value of lot 41 was $230,000, but Defendant requests that the roll real market value of $223,730 be sustained. (*See* Def's Ex A at 2.)

III. CONCLUSION

After carefully considering the testimony and evidence presented, the court finds that the 2010-11 real market value of each of the townhome lots was $42,000, reflecting no change from the real market values determined by BOPTA. The court further finds that the 2010-11 real market value of each of the detached lots was $54,000 per lot, a reduction from the real market values previously determined by Defendant and sustained by BOPTA. Finally, the court finds that the 2010-11 real market values of lot 16 and lot 41 shall remain unchanged.

IT IS THE DECISION OF THIS COURT that the real market value of properties identified as Accounts R2154956, R2154960, R2154965, R2154966, R2154967, R2154968, R2154969, R2154970, R2159471, R2154975, R2154978, R2154979, R2154980, R2154981, R2154984, and R2154987 were each $54,000 for the 2010-11 tax year.

IT IS THE DECISION OF THIS COURT that the real market value of properties identified as Accounts R2154915, R2154947, R2154961, R2154976, R2154977, R2154982, R2154983, and R2154986 shall remain unchanged for the 2010-11 tax year.

Dated this ____ day of January 2012.

_____
ALLISON R. BOOMER
MAGISTRATE PRO TEMPORE

*If you want to appeal this Decision, file a Complaint in the Regular Division of the Oregon Tax Court, by mailing to: 1163 State Street, Salem, OR 97301-2563; or by hand delivery to: Fourth Floor, 1241 State Street, Salem, OR.*

*Your Complaint must be submitted within 60 days after the date of the Decision or this Decision becomes final and cannot be changed.*

*This document was signed by Magistrate Pro Tempore Allison R. Boomer on January 23, 2012. The Court filed and entered this document on January 23, 2012.*